IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MUSTAFA-EL K.A. AJALA,
formerly known as DENNIS E. JONES-EL,

                                                    OPINION and ORDER

           Plaintiff,

                                                    16-cv-639-bbc

     v.

UW HOSPITAL AND CLINICS,
SUTCHIN PATEL, BURTON COX,
and SRIHARAN SIVALINGAM,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Pro se plaintiff and prisoner Mustafa-El Ajala is proceeding on claims that health care

staff at Wisconsin Secure Program Facility and University of Wisconsin Hospital and Clinics

failed to provide him adequate treatment for his hypercalcemia and hyperparathyroidism,

in violation of both the Eighth Amendment and state law.  Now before the court are motions

for summary judgment filed by University of Wisconsin Hospital and Clinics, dkt. #81, and

the state defendants (Sutchin Patel, Burton Cox and Sriharan Sivalingam), dkt. #73.  For

the reasons set out below, I will grant both motions.

Also before the court are plaintiff's motions for an order compelling discovery from

the state defendants (Sutchin Patel, Burton Cox and Sriharan Sivalingam) and for sanctions

against them, dkt. #66, motion for default judgment, dkt. #95, and motion requesting

permission to add citations to his summary judgment filings, dkt. #105.  I will deny

plaintiff's motions to compel, for sanctions and for default judgment, but will grant

plaintiff's motion to add citations to his summary judgment filings.

From the parties' proposed findings of facts and responses, I find the following facts to be material and undisputed unless otherwise noted.

## UNDISPUTED FACTS

### A. The Parties

Plaintiff Mustafa-El Ajala was incarcerated at Wisconsin Secure Program Facility during the times relevant to this lawsuit. Defendant Burton Cox was a doctor at the facility, and was plaintiff's treating physician from January 2003 to May 2005, and again from February 2007 to November 2010. Defendant Sutchin Patel was a urologist, employed by University of Wisconsin School of Medicine and Public Health. Defendant Sriharan Sivalingam was a urology fellow in endourology and minimally invasive surgery, and a clinical instructor for University of Wisconsin School of Medicine and Public Health. Plaintiff was treated by Patel and Sivalingam at defendant University of Wisconsin Hospitals and Clinics. (Plaintiff says that Patel and Sivalingam were employees and agents of University of Wisconsin Hospitals and Clinics, but he has cited no evidence to support this.)

### B. Plaintiff's Medical Treatment

Plaintiff began experiencing frequent and painful urination in approximately 2001. He also had high calcium levels in his blood starting in 2001 and blood in his urine in 2002. From 2003 to 2007, plaintiff had high calcium levels, occasional blood in his urine and

frequent urination. Plaintiff asked defendant Cox to diagnose his condition and provide treatment for it. In 2010, Cox referred plaintiff to the UW Urology Clinic for treatment.

1. 2010

Plaintiff saw defendant Dr. Patel at the UW Urology Clinic for the first time on April 30, 2010. Plaintiff had been given a diagnosis of overactive bladder and was taking lisinopril, vitamin D, hydrochlorothiazide, calcium carbonate, naproxen and oxybutynin. When evaluating a patient with urinary voiding symptoms, Patel's practice is to discuss a patient's symptoms and complete a urinalysis. Patel discussed plaintiff's symptoms with him and conducted a urinalysis, which showed "unremarkable" results. Patel also checked a post-void residual bladder scan, which showed that plaintiff was emptying his bladder adequately. Patel recommended a cystoscopy, which is a procedure to examine the lining of the bladder, so that he could evaluate plaintiff's urethra, prostate and bladder, and determine a possible cause for plaintiff's symptoms, such as a urethral stricture or bladder tumor. There is no mention in Patel's notes that plaintiff was concerned with kidney stones or high calcium levels in his blood at this visit. Dkt. #79-1 at 3.

Plaintiff saw Patel again on May 14, 2010. Plaintiff reported the same symptoms of urinary frequency and urgency. Id. at 9. Patel performed a cystoscopy, but he found no evidence of any stricture, lesions or tumors. Because these was no evidence of bladder outlet obstruction, Patel recommended that plaintiff stop taking Flomax and Doxazosin, which he had been taking to treat a potentially enlarged prostate. Patel recommended that plaintiff

start taking Ditropan XL, which is a medication used to treat overactive bladder symptoms (primarily urinary frequency and urinary urgency). When plaintiff returned to the prison, defendant Cox requested Ditropan XL for plaintiff from the Bureau of Health Services.

During plaintiff's third appointment with defendant Patel on August 20, 2010, plaintiff reported continued urinary frequency and urgency, dry mouth, hot flashes and occasional flank pain on his left side. He denied having urinary incontinence and told Patel that he did not have any history of having kidney stones. Id. at 13. Plaintiff was taking Ditropan three times a day, and Patel concluded that some of plaintiff's symptoms were likely side effects of that medication. Patel recommended that plaintiff change his medication to an extended release medication, such as Ditropan XL or Detrol, which would have fewer side effects. Patel conducted another urinalysis, which indicated that plaintiff did not have a urinary tract infection. The urinalysis showed "occasional calcium oxalate crystals." (Calcium oxalate crystals are the most common cause of kidney stones. Calcium oxalate crystals may be caused by dietary choices, but also may be caused by overactive parathyroid glands (hyperparathyroidism)). Because plaintiff had crystals and flank pain, Patel ordered a CT-scan to evaluate plaintiff's kidneys for possible hydronephrosis (swelling of the kidney due to a blockage in the ureter) and possible nephrolithiasis (kidney stones). Id.

Plaintiff saw defendant Patel again on November 12, 2010, and complained of lower back and left hip pain. Id. at 18. He denied any right or left flank pain. Plaintiff told Patel that his main symptoms were urinary urgency and frequency. Plaintiff had not yet received

4

the Ditropan XL or Detrol, and Patel recommended that plaintiff start taking one of those medications as soon as he could to address his overactive bladder symptoms. Patel recommended that plaintiff follow up with the UW Urology Clinic after he had started one of those medications.

Patel also discussed the results of the CT scan with plaintiff. The scan showed no evidence of infection, renal masses or hydronephrosis, but showed several very small kidney stones. Id. at 425. The stones were not obstructing the kidney and were asymptomatic, so Patel did not recommend any surgical intervention. Patel recommended that plaintiff increase his oral citrate intake with lemonade or lime juice and decrease his salt intake. Id. at 18. There is no indication in the notes that Patel thought plaintiff's kidney stones were related to his lower urinary tract problems.

Asymptomatic kidney stones by themselves do not cause pain, so patients can have a stone in their kidney for many years without symptoms. The stone must be blocking urine flow to cause pain. An obstructing stone can cause the kidney to swell (hydronephrosis). Patel generally recommends surgery if a patient has an obstructing stone or a large stone with a low chance of spontaneous passage. Kidney stones that are not obstructing should be monitored every couple of years to assess interval growth and the need for intervention. Depending on the patient and underlying causes of the kidney stones, calcium-based kidney stones may be prevented through dietary modifications, medications and surgical management of the parathyroid glands.

After plaintiff's appointment with Patel, defendant Cox did not prescribe oral citrate

5

for plaintiff. (According to Cox, he thought plaintiff could purchase lemonade from the canteen, but plaintiff says he told Cox that he could not purchase it himself.)

2. <u>2011</u>

On February 9, 2011, plaintiff had his blood drawn in the health services unit for lab work. The results showed a calcium level of 12 mg/dL (milligrams per deciliter), which is above normal levels. Dkt. #79-2 at 80. Cox ordered that the labs be repeated to check plaintiff's calcium levels again. <u>Id.</u> at 3. On February 16, 2011, plaintiff's lab results showed a calcium level of 11.4 mg/dL. <u>Id.</u> at 79. On March 2, 2011, Cox ordered that plaintiff's blood be drawn again to check his calcium and parathyroid hormone levels. <u>Id.</u> at 3. The results showed calcium at 11.3 mg/dL, which was down from previous testing, and parathyroid hormone at 59.5 pg/mL, which is within the normal range. <u>Id.</u> at 78. (Records from 2009 and 2010 show calcium levels between 11 and 11.8 mg/dL. <u>Id.</u> at 84, 93, 97.)

Plaintiff saw Dr. Patel again on April 29, 2011. Plaintiff reported that he had started taking Detrol LA, that the frequency and urgency of his urination had decreased by half and he was able to sleep through the night. Dkt. #79-1 at 24. He also denied any incontinence, painful urination, blood in his urine, abdominal pain or flank pain. (Plaintiff says he reported to Patel that his frequent and urgent need to urinate had "slightly" decreased, but that it was still occurring and had been ongoing for a decade.) Patel noted that plaintiff's overactive bladder appeared to be well controlled by Detrol LA. Patel ordered a uroflow test and a follow up appointment in one year.

According to Patel, he did not think that plaintiff's symptoms warranted the work-up for the diagnosis of hypercalcemia or hyperparathyroidism. "Hypercalcemia" is the presence of an excess of calcium in the blood. "Hyperparathyroidism" is the presence of excess parathyroid hormone in the body, causing an increase in serum calcium, a decrease in inorganic phosphorus, loss of calcium from bone and renal damage with frequent kidney-stone formation. Hyperparathyroidism can cause hypercalcemia. Symptoms of hypercalcemia caused by hyperparathyroidism can be mild to severe, and can include nausea, vomiting, constipation, kidney stones, fatigue, weakness, confusion, frequent urination, headaches, abdominal pain, sensory deficits, obtundation and coma. Patients with mild and moderate hypercalcemia (calcium in their blood that is less than 14 mg/dL) may not need immediate treatment, but rather a methodical evaluation of the causes and effects of their condition. Patients with calcium higher than 14 mg/dL require immediate treatment.

Patel thought plaintiff's primary symptom was urinary frequency, which has many common causes, and that plaintiff had no other obvious symptoms of hypercalcemia. The calcium oxalate crystals in plaintiff's urine had other potential causes, including diet. (Plaintiff says that his medical records show that he had experienced other symptoms of hypercalcemia, including high calcium levels in his blood, high blood pressure, an abnormal heart rhythm, abdominal pain, blood in his urine, kidney stones that were 100 percent calcium, calcification of his prostate and coronary artery and fatigue. However, he does not point to any evidence suggesting that he was experiencing these symptoms at the time of his appointments with Patel or that Patel was aware of these symptoms.)

On August 22, 2011, plaintiff was taken to the emergency room because he was experiencing blood in his urine and pain. A CT scan showed that plaintiff had developed new kidney stones since his 2010 scan. He had a 3 millimeter stone and two very small stones in his left kidney and a 2 millimeter stone in his left ureter. There were no stones in his right kidney. Dkt. #79-2 at 161. He was given Vicodin and sent back to the prison to pass the stones. Id. at 41. When he returned, plaintiff asked Cox to treat his high calcium levels because they were causing his stones.

3. <u>2012</u>

Plaintiff saw defendant Sivalingam at UW Urology for the first time on April 27, 2012. Dkt. #79-1 at 29. Plaintiff continued to complain of urinary urgency and frequency, though he reported that his urine stream was good and that his urinary frequency had declined since taking Detrol LA. He stated that he had been drinking lots of fluids to try to prevent the formation of new kidney stones. Plaintiff also told Sivalingam about his hospital visit for kidney stones and said that he wanted something to treat his persistently high calcium levels.

Plaintiff's urinalysis did not show any obvious causes for plaintiff's persistent lower urinary tract symptoms, and plaintiff's uroflow test demonstrated good overall bladder health and function. Sivalingam thought plaintiff's symptoms were troublesome because the etiology of his urinary frequency was unknown and plaintiff continued to experience urinary frequency even while taking Detrol LA. Id. at 30. Sivalingam recommended that plaintiff

take Detrol LA on a scheduled daily basis, rather than on an "as needed" basis. Sivalingam also ordered additional labs so that he could have a baseline creatinine function for plaintiff, which could help determine any underlying kidney dysfunction or electrolyte imbalance resulting from urinary retention or high pressure voiding from bladder outlet obstruction. Sivalingam ordered a follow up in three months.

In May 2012, defendant Cox ordered blood labs, which showed calcium level of 11.5 mg/dL. Dkt. #79-2 at 155. Cox noted that plaintiff's calcium levels were stable.

Plaintiff saw Sivalingam again on August 3, 2012. Plaintiff says he again asked Sivalingam about his high calcium levels and kidney stone problems. Sivalingam reviewed plaintiff's lab results, which showed normal electrolytes and serum creatinine, but an elevated serum calcium level of 11.5 mg/dL. Dkt. #79-1 at 35. Such results could indicate dehydration, overactive parathyroid glands, malignancy or other diseases such as sarcoidosis or excessive supplementation. Plaintiff's results indicated mild hypercalcemia, which means less than 12 mg/dL of serum calcium. (In Sivalingam's opinion, mild hypercalcemia by itself may not require immediate treatment. He generally advises patients with mild hypercalcemia to reduce the risks for high calcium by hydrating, avoiding bedrest or inactivity and lowering the calcium in their diets. Typical symptoms of moderate to severe hypercalcemia that would prompt urgent or immediate attention would be nausea, constipation, high urine outbursts, thirst, weakness, problems with concentration, confusion or even coma.)

Sivalingam could not identify any specific cause for the symptoms of urinary frequency that plaintiff was experiencing, but he did not see any need for further intervention at that time because plaintiff's urine flow was good and his bladder was emptying well. Sivalingam advised plaintiff to continue taking Detrol LA, because it was providing some relief, and to follow up in one year with a uroflow and postvoid residual measurement. Sivalingam also ordered that an x-ray of plaintiff's kidney, ureter and bladder be taken prior to the next visit to "assess for any progression of [plaintiff's] urinary stone disease." Id. at 36. (At the time, Sivalingam knew that plaintiff had a history of kidney stones, high calcium levels and a record of swelling of the kidney due to the buildup of urine.)

In August 2012, plaintiff had a CT scan of his abdomen which showed three kidney stones. (It is not clear from the records who ordered this CT scan or who saw the results of it.) In November 2012, plaintiff complained of painful urination and reported to health services that he had passed a stone. Dkt. #79-2 at 174. A urine sample was collected and strained, and one small stone was found.

In November 2012, defendant Cox researched medical literature for studies on stone prevention. He read that lemon juice increases the amount of citrate in the urine, which can prevent the development of kidney stones. He placed an order for food services to supply plaintiff with lemon juice every day. Id. at 181. (Plaintiff says that Cox already knew or should have known about lemon juice and kidney stones, based on recommendation and literature provided by Patel in 2010, and also because Cox had treated many people with

kidney stones in the past.)

4. <u>2013</u>

In April 2013, health services staff ordered new lab work for plaintiff to check his calcium and parathyroid hormone levels and to rule out hyperparathyroidism. Dkt. #79-2 at 169. Plaintiff's calcium level was 12 mg/dL and his parathyroid hormone level was elevated. Because his calcium and his parathyroid hormone were elevated, health services staff referred him to UW Endocrinology for an evaluation. <u>Id.</u>

On May 24, 2013, plaintiff saw Sivalingam again and reported bilateral flank pain. Sivalingam's notes say that plaintiff "initially presented to us in Urology for voiding symptoms; however, at this time he comes for assessment of his flank pain." Dkt. #79-1 at 41. A CT scan showed multiple kidney stones on both sides, a large stone obstructing his ureter on the right side and significant hydronephrosis on the right side. Dkt. #79-2 at 224. Plaintiff was on Naproxen for pain control and reported occasional blood in the urine, but he denied fevers or chills. He complained of frequent urination, bilateral flank pain, burning urination and kidney stones. Sivalingam noted that plaintiff was "awaiting workup with Endocrinology for potential hyperparathyroidism as [plaintiff] has hypercalcemia at 12.4." <u>Id.</u> Sivalingam discussed management options with plaintiff, including stent placement for relief of the obstruction, shockwave lithotripsy or ureteroscopy to treat his kidney stones. The stone needing the most immediate attention was the obstructing stone. Plaintiff consented to Sivalingam's removal of the stone surgically with a ureteroscopy treatment.

Sivalingam's plan was to initiate a metabolic work up for plaintiff's kidney stone disease after his surgery.

A May 29, 2013, labs showed plaintiff's calcium level at 12.1 mg/dL. A urinalysis order by UW Urology on June 3, 2013, showed that plaintiff had elevated parathyroid hormone levels. Id. at 82. At this point, the UW Urology notes stated that plaintiff had "possible hyperparathyroidism." Id. at 53.

On June 3, 2013, Sivalingam and other urologists attempted to perform a ureteroscopy surgery to remove the obstructing stone, but they were unable to do so because the stone was too impacted. During the procedure, plaintiff's urethra was perforated, so the procedure was aborted and a nephrostomy tube was placed in plaintiff's kidney. Id. at 48. UW Urology staff recommended that plaintiff be given Vicodin, a narcotic pain medication, after this surgery. Id. at 52. Plaintiff was discharged to the prison on June 4, and an order was placed for plaintiff to receive Vicodin up to four times a day as needed for pain control.

On June 11, 2013, a health services nurse notified a doctor that plaintiff's order for Vicodin had expired. The doctor, Dr. Adler (who is not a defendant) ordered that plaintiff could receive one tablet of Vicodin four times a day for pain until June 18, 2013, up to a maximum of 28 tablets.

On June 13, plaintiff was seen at UW Urology for the rescheduled stent placement and removal of his urethral nephrostomy tube. When he returned from the hospital, plaintiff received Vicodin at his cell and again at bedtime. On June 14, Dr. Adler increased the Vicodin dose to up to two tablets four times a day as needed for pain, and ordered 20 more

tablets of Vicodin for plaintiff. The prescription was extended to one day, to stop on June 19, 2013. Plaintiff received Vicodin for pain relief four times on June 14, 15 and 16.

Narcotics such as Vicodin present serious risks of abuse in prison. Inmates confined in a prison setting often have substance abuse problems, and some inmates save medication and distribute them to other inmates who are susceptible to abuse.

On June 16, a nurse wrote in plaintiff's progress notes that plaintiff was not lifting his tongue when asked to show that he had swallowed his medication. It was the second time that had occurred on June 16, so the nurse notified security staff. Staff conduced a cell search and found two Vicodin tablets in plaintiff's cell. The nurse called the on-call doctor, Dr. Larsen, who discontinued the prescription. (Plaintiff says that it was defendant Cox that discontinued the prescription, but the evidence shows that Larsen discontinued the prescription, with Cox approving the discontinuance on the following day. Dkt. #79-2 at 296.) Plaintiff wrote to Cox explaining that he had kept the Vicodin pills in case he needed them for pain later, and he told Cox that his current pain was unbearable. Cox responded that plaintiff would have to endure the pain until his next surgery, which was scheduled for June 27.

Between June 14 to June 27, 2013, plaintiff was given acetaminophen for general pain relief and phenazopyridine to help alleviate his symptoms of painful urination. (Taking naproxen or ibuprofen for pain relief would have violated preoperative instructions from UW.) Plaintiff told Cox that he was having painful urination more than 25 times a day, that he could not sleep and that the medications were not relieving his pain. Cox declined

plaintiff's request for Vicodin and declined to provide stronger pain medication by crushing pills, tethering plaintiff to the door when medication was dispensed or providing injectable pain medication.

On June 27, Sivalingam and two other UW physicians performed a stent placement and lithotripsy on plaintiff for his right kidney stones. Id. at 157. Plaintiff tolerated the procedure well and was discharged on June 28, with the recommendation that he take Norco, a narcotic, as needed for pain. Id. at 161. Cox prescribed Norco to plaintiff and also potassium citrate, which was intended to reduce plaintiff's risk for recurring stones. On July 5, Sivalingam performed the stent removal for plaintiff and recommended a follow up to discuss stone prevention, including a complete metabolic workup to evaluate plaintiff for hyperparathyroidism, vitamin D abnormalities or other problems. Id. at 290. The July 5 appointment was Sivalingam's last encounter with plaintiff regarding his kidney stones.

On July 15, 2013, plaintiff had a parathyroid scan at UW Radiology that showed what appeared to be an "ectopic parathyroid gland adenoma." Dkt. #79-1 at 429. Cox ordered the scan. At his August 2013 appointment with UW Urology, the plan was to monitor plaintiff's current kidney stones, obtain another x-ray in three months and consider another surgery if necessary. However, urologist noted that if the etiology of the stones was due to plaintiff's parathyroid gland, "removal of the nodule/adenoma would potentially treat the stone problem." Id. at 295.

On August 13, 2013, plaintiff met with a physician from UW General Surgery, who performed an ultrasound and confirmed that plaintiff had a parathyroid adenoma. She gave

him a diagnosis of primary parathyroidism. Id. at 302.

On September 16, 2013, plaintiff had a parathyroidectomy. Following the surgery, his calcium and parathyroid hormone levels dropped to normal levels. Id. at 396. Plaintiff says that his condition was cured by the surgery, resolving the hypercalcemia, hyperparathyroidism, kidney stones, high blood pressure, urinary frequency and many other symptoms.


OPINION

A. Plaintiff's Motion to Compel and for Default Judgment as a Sanction

Plaintiff filed a motion to compel, contending that he served three sets of discovery requests on defendants and that defendants failed to respond fully to the first two sets and failed to respond to the third set at all. Dkt. #66. He has moved for an ordering compelling defendants to respond and for sanctions against them. Defendants object to the motion, arguing that they responded adequately to plaintiff's first and second discovery requests, and that they never received a third set of discovery requests from plaintiff. Because plaintiff has failed to show that defendants' responses are inadequate, I will deny the motion

Defendant Cox's responses to questions about when and how he referred plaintiff to UW specialists are adequate, as are Cox's responses about what information he provided to the specialists. Although plaintiff contends that Cox should have included more detailed information in his interrogatory responses, plaintiff's interrogatory requests are worded broadly and do not identify a specific time frame. Dkt. #71 at 7-8. Cox provided what he

believed to be the most pertinent information, and stated that additional information could be found in plaintiff's medical records. As to plaintiff's question about whether Cox had treated hypercalcemia and Cox's knowledge about the condition in 2007 and 2010, Cox explains that his answer regarding kidney stones was intended to encompass hypercalcemia and that he possessed this knowledge in 2007 and 2010. Id. at 9. Cox's refusal to provide contact information for other physicians working at Wisconsin Secure Program Facility, id. at 10, was justified for security reasons.

The responses by defendants Patel and Sivalingam are also adequate. Both Patel and Sivalingam explained that they were authorized by the UW Department of Urology to treat patients at UW Hospital and Clinics, and they explained that they were aware of potential medical problems associated with high calcium levels and kidney stones. There does not appear to be any dispute that Patel or Sivalingam knew about hypercalcemia, hyperparathyroidism or kidney stones at the time they treated plaintiff. Therefore, I will deny plaintiff's motion to compel and for sanctions.

Plaintiff also filed a "motion for default judgment as a sanction for defendants lying under oath and obstructing the discovery process." Dkt. #95. In his motion, plaintiff contends that several of defendants' proposed findings of fact are contradicted by other evidence in the record, proving that defendants are lying. I disagree. Although the parties' interpret the evidence differently, plaintiff has not shown that defendants have intentionally misled the court or plaintiff. Therefore, I will deny his motion for default judgment.

## B. Defendant UW Hospital and Clinics

Defendant UW Hospital and Clinics has moved for summary judgment on the ground that under Wis. Stat. § 233.17, it cannot be held liable for the acts of defendants Patel and Sivalingam, who were members of the academic staff in the Department of Urology at UW School of Medicine and Public Health at the time they treated plaintiff. Although plaintiff argues that Patel and Sivalingam must have been agents of the Hospital because they treated him at the Hospital, he has not submitted any evidence to support his assertion.

Under § 233.17, no members of the faculty or academic staff of the UW System may be considered an agent of UW Hospital and Clinics so long as they are acting within the scope of their employment. See also Suchomel v. University of Wisconsin Hospital and Clinics, 2005 WI App 234, ¶ 26, 288 Wis. 2d 188, 204, 708 N.W.2d 13, 20–21 (faculty are state employees and not agents of hospital). Because it is undisputed that Patel and Sivalingam were academic staff members at the university and were acting within the scope of their employment when they treated plaintiff, defendant UW Hospital and Clinics cannot be held liable for their conduct. Therefore, I will grant UW Hospital and Clinics's motion for summary judgment.

## B. Defendants Cox, Patel and Sivalingam

Plaintiff is proceeding on claims that defendants Cox, Patel and Sivalingam violated his rights under the Eighth Amendment and state negligence law by failing to properly diagnose and treat his hypercalcemia and hyperparathyroidism.

1.  Legal standards

The Eighth Amendment's prohibition on cruel and unusual punishment "protects prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain,'" including "grossly inadequate medical care." Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). To prevail on a claim based on deficient medical care, the plaintiff must demonstrate two elements: (1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition. Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011). The first element, an objectively serious medical condition, is satisfied if a physician has diagnosed the condition as requiring treatment, or the need for treatment would be obvious to a layperson. Pyles, 771 F.3d at 409. There is no dispute in this case that plaintiff's urinary tract problems, hypercalcemia and hyperparathyroidism were serious medical conditions that required treatment.

There is a dispute about the second element of plaintiff's claim, "deliberate indifference," which is a subjective standard. Arnett, 658 F.3d at 751. "Deliberate indifference" means that the officials were aware that the prisoner faced a substantial risk of serious harm but disregarded the risk by consciously failing to take reasonable measures to address it. Forbes v. Edgar, 112 F.3d 262, 266 (7th Cir. 1997). In cases in which a prisoner alleges that he received some treatment for his medical condition, but that the treatment was inadequate, the relevant question is whether the medical provider's actions were "such a substantial departure from accepted professional judgment, practice, or

standard, as to demonstrate that the person responsible actually did not base the decision on such a judgment." Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261-62 (7th Cir. 1996). In such cases, courts must defer to a medical professional's treatment decision unless no minimally competent professional would have chosen the same course of treatment under the circumstances. Pyles, 771 F.3d at 409. A "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." Id. But a medical provider may violate the Eighth Amendment if the provider prescribes a course of treatment without exercising medical judgment or that the providers knows will be ineffective. Whiting v. Wexford Health Sources, Inc., 839 F.3d 658, 662–63 (7th Cir. 2016).

Evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment, the defendant's persistence in "a course of treatment known to be ineffective," or proof that the defendant's treatment decision departed so radically from "accepted professional judgment, practice, or standards" that a jury may reasonably infer that the decision was not based on professional judgment. Id. A medical professional's choice to pursue an "easier and less efficacious treatment" or "a non-trivial delay in treating serious pain" may also support a claim of deliberate indifference. Berry v. Peterman, 604 F.3d 435, 441 (7th Cir. 2010) (citation omitted).

To prevail on a claim for negligence in Wisconsin, plaintiff must prove that defendants breached their duty of care and that he suffered injury as a result. Paul v. Skemp,

2001 WI 42, ¶ 17, 242 Wis. 2d 507, 520, 625 N.W.2d 860, 865. Wisconsin law more specifically defines medical negligence as the failure of a medical professional to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." Sawyer v. Midelfort, 227 Wis. 2d 124, 149, 595 N.W.2d 423, 435 (1999); Shuster v. Altenberg, 144 Wis. 2d 223, 229, 424 N.W.2d 159, 161–62 (1988). To succeed on his claims against defendants, plaintiff has to show that Cox, Patel and Sivalingam failed to use the required degree of skill exercised by an average doctor under the circumstances, that he suffered harm, and that there is a causal connection between the doctors' failures and his harm. Wis J–I Civil 1023. Expert testimony is required to establish the standard of care, unless "the situation is one in which common knowledge affords a basis for finding negligence." Sheahan v. Suliene, Case No. 12-cv-433-bbc, 2014 WL 1233700, at *9 (W.D. Wis. 2014).

   a. Dr. Cox

Plaintiff contends that defendant Dr. Cox acted with deliberate indifference to his serious health needs by failing to diagnose and treat plaintiff's hypercalcemia, hyperparathyroidism and kidney stone disease despite plaintiff's repeated requests for help. Because it is undisputed that Cox provided plaintiff with some treatment, the relevant question under the Eighth Amendment is whether plaintiff has submitted evidence to show that Cox failed to use medical judgment in making treatment decisions. Under negligence law, the question is whether Cox failed to use the required degree of skill expected of an

average prison doctor under the circumstances.

Plaintiff has not shown that Cox failed to use medical judgment or failed to use the appropriate standard of care in treating him. As an initial matter, I agree with defendants that plaintiff cannot bring claims for Cox's treatment decisions before September 2010. Those claims are barred by the six-year statute of limitations applying to § 1983 claims in Wisconsin, and plaintiff has not shown that the continuing violation or continuum of care doctrine would apply. Turley v. Rednour, 729 F.3d 645, 651 (7th Cir. 2013) (Eighth Amendment continuing violation doctrine); Forbes v. Stoeckl, 2007 WI App 151, ¶ 5, 303 Wis. 2d 425, 430, 735 N.W.2d 536, 539 (Wisconsin's continuum of care doctrine). Plaintiff has not shown that he had hypercalcemia or hyperparathyroidism before 2010 or that Cox's treatment decisions were part of a series of related decisions such that they belong in the same lawsuit.

As for Cox's post-2010 treatment, the evidence shows that in 2010, plaintiff's primary complaint to Cox was that he was having unfavorable urinary tract symptoms, including urinary frequency and occasional blood in his urine. Although plaintiff also had several blood tests showing high calcium levels before and during 2010, plaintiff's calcium levels had remained stable and he had not reported any kidney pain or a history of kidney stones. Therefore, Cox referred plaintiff to urology specialists at UW Urology for his urinary tract problems. After Cox referred plaintiff to specialists, Cox relied on those specialists for recommendations and appropriate testing. Plaintiff saw the specialists fairly regularly, and Cox accepted nearly all of the specialists' recommendations for treatment for plaintiff. Cox

also continued to monitor plaintiff's calcium levels in 2011, 2012 and 2013, eventually referring plaintiff to UW Endocrinology in April 2013 when plaintiff's labs showed heightened parathyroid levels. No reasonable jury could conclude that Cox's treatment decisions, referrals and reliance on specialists amounted to deliberate indifference or negligence.

However, plaintiff identifies two specific instances in which he says that Cox acted with deliberate indifference or failed to act within the standard of care for a reasonable prison physician. First, he points to Cox's failure to order oral citrate in 2010 after defendant Patel recommended that plaintiff increase his citrate intake to decrease his risk of developing kidney stones. The parties dispute whether plaintiff could have purchased oral citrate from the commissary. However, even assuming that plaintiff could not have taken steps to increase his citrate intake on his own and that Cox knew this, plaintiff has not submitted evidence showing that Cox knew that failing to prescribe oral citrate to plaintiff would expose him to a substantial risk of serious harm. Patel recommended that plaintiff increase his oral citrate, but he did not order any particular prescription for plaintiff. In addition, at the time that Patel recommended the oral citrate, Cox and Patel were still focused on treating plaintiff's urinary problems. At that point, it was not yet clear that plaintiff's kidney disease might be the more serious medical problem. Finally, plaintiff has not shown that he was actually harmed by Cox's failure to prescribe oral citrate. Instead, the evidence shows that plaintiff's kidney stones were caused by an overproduction of parathyroid hormone. Plaintiff has not shown that if Cox had prescribed oral citrate in 2010

would have made any difference for plaintiff. Therefore, no reasonable jury could conclude that Cox was deliberately indifferent or negligent for failing to prescribe oral citrate.

The second instance that plaintiff points to is Cox's decision to approve the discontinuance of plaintiff's Vicodin prescription in June 2013, after plaintiff was found to be keeping Vicodin in his cell. Plaintiff argues that Cox's decision shows deliberate indifference and negligence, because Cox knew that plaintiff was in extreme pain and that the alternative medications were not relieving his pain. Plaintiff's arguments are not persuasive. At the time the prescription was discontinued, plaintiff had received Vicodin for ten days post-surgery. Prison officials have a strong interest in controlling narcotics in the prison and plaintiff knew that he was breaking prison rules by hoarding a narcotic medication. Thus, health services staff was justified in cancelling his Vicodin prescription and attempting to control his pain with other medication. The Court of Appeals for the Seventh Circuit has routinely rejected claims that are "based on a preference for one medication over another unless there is evidence of a substantial departure from acceptable professional judgment." Lockett v. Bonson, 937 F.3d 1016, 1024 (7th Cir. 2019). See also Burton v. Downey, 805 F.3d 776, 785–86 (7th Cir. 2015); Snipes v. DeTella, 95 F.3d 586, 591 (7th Cir. 1996) (noting that "[t]he administration of pain killers requires medical expertise and judgment" and that their use "entails risks that doctors must consider in light of the benefits"). Cox exercised his medical judgment in determining which pain medication to prescribe to plaintiff in light of plaintiff's actions. No reasonably jury could conclude that Cox failed to use medical judgment or made a decision that fell below the standard of care

for a prison doctor under the circumstances. Accordingly, Cox is entitled to summary judgment.

b. Dr. Patel

Plaintiff contends that defendant Dr. Patel acted with deliberate indifference and negligence by failing to diagnose and treat plaintiff's hypercalcemia and hyperparathyroidism despite plaintiff's obvious symptoms of these conditions. However, the evidence in the record does not support plaintiff's claim. Plaintiff was referred to defendant Patel specifically for treatment of plaintiff's lower urinary tract symptoms. Ultimately, plaintiff saw Patel five times, within an approximately one-year period, for plaintiff's lower urinary tract complaints. The evidence shows that at each visit, Patel asked plaintiff about his symptoms, evaluated plaintiff's complaints and chose a plan of treatment that Patel thought was most appropriate under the circumstances.

Plaintiff's first visit with Patel was in April 2010. Patel performed a scan of plaintiff's bladder and recommended that a cystoscopy be performed in a follow up visit. At the second visit, in May 2010, Patel performed a cystoscopy and found no evidence of bladder outlet obstruction, so he discontinued plaintiff's medications that had been prescribed for obstruction or stricture. Patel also recommended that plaintiff try a new medication for his urinary frequency. During plaintiff's third visit on August 20, 2010, plaintiff continued to report urinary frequency and urgency and some side effects from his medication. Patel altered the dosage of plaintiff's medications and performed a urinalysis that indicated

possible kidney stones. Plaintiff told Patel that he did not have a history of kidney stones, but at the fourth visit in November 2010, Patel performed an additional urinalysis and CT scan to check for kidney stones. Patel determined that plaintiff had kidney stones, but that they were asymptomatic and did not meet the cirteria for surgical intervention. He recommended dietary changes that plaintiff could implement to prevent future stones and prescribed some medications for plaintiff's continued overactive bladder symptoms. At the final appointment, in April 2011, plaintiff reported that his urinary frequency and urgency had decreased, that he was sleeping through the night and that he no longer had abdominal or flank pain. Patel concluded that plaintiff's symptoms were controlled with medication and Patel ordered a follow up in a year.

In light of this treatment record, no reasonable jury could conclude that Patel acted with deliberate indifference or negligence toward plaintiff's serious medical needs. Plaintiff was referred to Patel for treatment of his urinary urgency and frequency, and Patel attempted to treat those symptoms. He did not persist in a single course of treatment, but instead, he conducted numerous tests and prescribed different medications, ultimately providing some relief for plaintiff's symptoms. At the time Patel was treating plaintiff, plaintiff had no history of kidney disease or kidney stones and had not reported abdominal or flank pain. Besides his urinary urgency and kidney stones, plaintiff had no obvious symptoms of moderate or severe hypercalcemia or hyperparathyroidism, such as nausea, vomiting, constipation, fatigue, weakness, confusion, headaches, abdominal pain, sensory deficits, obtundation or coma. Although plaintiff's calcium levels had been high, they had

been stable for several years and he had not developed kidney stones. There is no evidence suggesting that a urologist treating a patient with symptoms similar to plaintiff's would have provided different treatment. Accordingly, Patel is entitled to summary judgment.

c. Dr. Sivalingam

Plaintiff contends that defendant Sivalingam also failed to properly diagnose and treat plaintiff's hypercalcemia and hyperparathyroidism. However, as with his claims against Cox and Patel, plaintiff has failed to submit evidence showing that Sivalingam failed to exercise medical judgment or failed to use the appropriate standard of care when treating plaintiff.

As plaintiff points out, at the time Sivalingam began treating plaintiff in April 2012, plaintiff had a history of high calcium levels and had been to the emergency room for pain caused by kidney stones. Plaintiff argues that Sivalingam should have known, or at least should have suspected, that plaintiff had hypercalcemia and hyperparathyroidism and should have either provided treatment for those conditions or referred plaintiff to UW Endocrinology sooner.

However, at the time Sivalingam began treating plaintiff, plaintiff's primary symptoms were still his urinary tract problems. Although he had experienced kidney stones, he did not report any abdominal or flank pain to Sivalingam at his first two appointments, and plaintiff's most recent CT scans showed small stones that did not need surgical intervention. In addition, plaintiff's calcium levels were still in the range of mild or moderate hypercalcemia, which Sivalingam believed did not require treatment. Plaintiff has

not submitted any evidence from which a jury could conclude that Sivalingam's treatment decisions were deliberately indifferent or negligent in light of plaintiff's reported symptoms and the objective medical testing.

Instead, the evidence shows that Sivalingam attempted to treat plaintiff's most urgent and problematic symptoms. At plaintiff's first appointment with Sivalingam, Sivalingam noted that plaintiff's symptoms were troublesome because he was taking Detrol LA and still had urinary urgency symptoms. Sivalingam made some changes by ordering Detrol LA on a daily basis, rather than on an as needed basis. He also ordered an electrolyte draw and scheduled a follow up for three months. During the second appointment in August 2012, Sivalingam noted a slightly elevated serum calcium level, and Sivalingam ordered an x-ray and follow up to assess for any progression of plaintiff's kidney stones.

Plaintiff saw Sivalingam next in May 2013. By this time, plaintiff's labs showed that he had high parathyroid hormone levels and plaintiff had been referred to UW Endocrinology. Sivalingam ordered a CT scan, which showed bilateral kidney stones and one particularly concerning stone. Sivalingam discussed options with plaintiff, and later attempted to remove the stone surgically. After the first surgery was unsuccessful, plaintiff later returned and the problematic stone was removed. From the medical records, it appears that plaintiff's care was then taken over by UW Endocrinology and UW General Surgery. This treatment record does not support a claim of deliberate indifference or negligence against Sivalingam.

In sum, although I am sympathetic to the pain and frustration that plaintiff

experienced as a result of his hypercalcemia and hyperparathyroidism, plaintiff has not shown that defendants Cox, Patel or Sivalingam consciously disregarded his serious medical needs or failed to act with the requisite standard of care. Therefore, I will grant their motion for summary judgment and close this case.

ORDER

IT IS ORDERED that

1. Plaintiff Mustafa-El Ajala's motion to file a replacement copy of his proposed findings of fact and responses, dkt. #105, is GRANTED.

2. Plaintiff's motion for an order compelling discovery and for sanctions, dkt. #66, and motion for default judgment as a sanction, dkt. #95, are DENIED.

2. The motion for summary judgment filed by defendants Burton Cox, Sutchin Patel and Sriharan Sivalingam, dkt. #73, is GRANTED.

3. Defendant UW Hospital and Clinic's motion for summary judgment, dkt. #81, is GRANTED.

4. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 6th day of November, 2019.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge